2023 PA Super 27

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                                   :            PENNSYLVANIA
                                                   :
                    v.                             :
                                                   :
                                                   :
DALISHIA DANIKA SALTER            :
                                                   :
            Appellant                          :  No. 253 WDA 2022

Appeal from the Judgment of Sentence Entered November 30, 2016
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0016990-2014

BEFORE:   STABILE, J., KING, J., and COLINS, J.*

OPINION BY COLINS, J.:                    **FILED:  February 17, 2023**

Dalishia Danika Salter appeals *nunc pro tunc* from the judgment of sentence imposed after a jury found her guilty of aggravated assault, endangering the welfare of a child, simple assault, recklessly endangering another person, and falsely reporting to law enforcement.[1] For these offenses, Salter was sentenced to a total of seven-and-one-half to fifteen years of incarceration, with Count I, the aggravated assault conviction, specifically receiving an aggravated sentence. On appeal, Salter solely contends that the lower court abused its discretion in determining that an aggravated sentence was necessary at Count I. In particular, Salter faults the lower court's reliance on her apparent failure to display emotion and/or remorse at trial. We affirm.

---

* Retired Senior Judge assigned to the Superior Court.

[1] *See* 18 Pa.C.S.A. § 2702(a)(9); 18 Pa.C.S.A. § 4304(a)(1); 18 Pa.C.S.A. § 2701(b)(2); 18 Pa.C.S.A. § 2705; and 18 Pa.C.S.A. § 4906(a), respectively.

As eloquently and completely summarized by the court:

During the late evening of September 12, 2014, [Salter] brutally assaulted her infant son, [D.B.], who was eleven (11) months old at the time of the assault. After she beat [D.B.], [Salter] put him outside in the dark, in a car seat, on the back porch of her Wilkinsburg home, next to the garbage. [Salter] then sent text messages to David Bryant, the father of the child at approximately 11:30 p.m., which stated the following:

"Beat df out ya son big ass knot bleedn putn him outside u want dat piece of shit take em cuz bet ima kill him bitch!!!!!!" (11:34[ p.m.] )

"He will be outside bitch" (11:46[ p.m.] )

"On god! Prob die n too idgaf FUCK U AND HIM STG BETTER TAKE EM TO DA." (11:48[ p.m.] )

David Bryant was at a friend's house in Wilkinsburg when he received the text messages from [Salter]. David Bryant previously had dated [Salter] for a number of years. The two had a tumultuous and volatile relationship, and they were no longer together at the time of the incident. [Salter's] text messages caused David Bryant to become concerned for his son, so he went to [Salter's] home and found his injured son outside on the back porch, right where [Salter] had said that she left him.

When he arrived at the back porch of [Salter's] home, David Bryant began video recording what he saw on his cell phone. The video captures [D.B.], alone and crying outside on the porch, as well as David Bryant's emotional reaction to finding his injured son. David Bryant can be heard sobbing and banging on the door. He eventually kicked down the door of [Salter's] house after she failed to answer the door. The video captures what happens inside of the apartment, while the audio reveals David Bryant in a distressed and panicked state. As he is crying, he is heard repeatedly saying to [Salter], "you hit my fucking son!?"[,] "you beat my son like that yo!?["," "you hit my son like that!?"[, and] "you put your hands on my fucking son!?" In response to David Bryant's questions about beating [D.B.], [Salter] is heard repeatedly stating, "I don't care," "Oh well," "I told you to get him," "Bitch I don't care." David Bryant testified that he was "not

thinking straight" and left the house. He called an ambulance, contacted his sister, and spoke with the police on the phone that night. The text messages sent by [Salter], and the video taken by David Bryant, were provided to the police that night by Tennille Webb, David Bryant's sister.

At approximately 1:00 a.m. on the morning of September 13, 2014, multiple officers from the Wilkinsburg Police Department were dispatched to [Salter's] residence after receiving a report of "possible child abuse that had occurred" at the home. When the officers entered [Salter's] apartment, they encountered [Salter] in the living room, which was located approximately 25 to 50 feet away from the bedroom where [D.B.] was now located. The officers noticed that, although [Salter's] lip was bloody and swollen, she was "very calm" and did not appear to be in any "kind of distress at that time." The officers entered the master bedroom and observed [D.B. lying] on an adult bed, which did not have any safety railings surrounding it. The child was crying and was in obvious distress, and officers "immediately noticed he had bruising about the face [and] head" and that his nose was bleeding. It was apparent to the officers that the child had been assaulted and that he required immediate medical attention. Medical personnel arrived on the scene shortly thereafter, and [D.B.] was transported to Children's Hospital. [Salter] did not show or express any kind of emotion or concern for her child during her interaction with the officers. She did not ask where the child was being transported[,] and she did not ask to accompany her child to the hospital.

When asked how [D.B.] had sustained his injuries, [Salter] told officers that she had been in an altercation with David Bryant earlier that evening. She stated that she was in her bedroom sleeping, with [D.B.] asleep at the foot of her bed, when David Bryant broke into her house. [Salter] further stated that David Bryant "went around the bed" and "pushed a [flatscreen] TV down on top of the bed where" she was lying with the child, which caused the 55-inch television to fall on top of [D.B.]. When officers entered the bedroom, they noticed that the television was sitting upright on top of a tall dresser and that the screen had been broken. The dresser was approximately 5 feet tall.

[Salter] then told police that David Bryant attempted to assault her and broke her cell phone. When [Salter] tried to reach for another cell phone on the other side of the bed, David Bryant took

- 3 -

the phone and "a set of keys, broke some pictures around the apartment, then fled the residence." [Salter] told the officers that after David Bryant left the apartment, she attempted to get her child dressed, then placed him in the car seat and put him on the back porch while she "attempted to gather some belongings." [Salter] told the officers that she was unsure of what to do next, so she "sat on the bed for approximately an hour" and did not contact police or seek medical attention for her child, who, according to her, had just had a 55[-]inch television fall on top of him.

[Salter's] version of events left the officers with "major questions" surrounding the incident, so [Salter] was asked to accompany the officers to the police station to answer more questions. In the meantime, the officers also attempted to locate David Bryant to ascertain his version of events. The officers went to his sister's house, where she provided the officers with the text and video evidence from that evening. Upon reviewing that evidence, the officers placed [Salter] under arrest for assaulting her child. By the time the officers reviewed the text messages and video, approximately an hour and a half had passed since [D.B.] had been assaulted.

At the Children's Hospital of Pittsburgh, [D.B.] underwent a CT scan of his head and additional x-rays. He was then admitted to the pediatric ICU unit. [D.B.] was placed in a neck collar, and he "had to have an abdominal CT because he had evidence of abdominal injury." Dr. Jennifer Wolford, the attending physician in the Division of Child Advocacy at Children's Hospital, was consulted to evaluate [D.B.] due to the nature of his injuries. Her primary responsibility is the "evaluation and assessments of child abuse and child maltreatment."

Upon her examination of [D.B.], it was clear to Dr. Wolford that he had sustained numerous and serious injuries. Dr. Wolford noted that [D.B.] had "significant bruising to both sides of his face," and that he was in the "third percentile for his age[ ]" [with respect to his weight.] Dr. Wolford also observed that [D.B.] had bruising and swelling across his nose, and that he was bleeding underneath his right eye. [D.B.] had "bursted blood vessels" in "the inner part of his right eye," which indicated blunt trauma. [D.B.] had suffered a "subconjunctival hemorrhage," and he had "skull fractures in the rear sides of his head above his ears on both sides." The bruising and inflammation that he suffered also

- 4 -

extended into his hairline and ears. [D.B.] suffered "trauma on both sides of his face" and had "multiple bruises" in "multiple planes of his body." Dr. Wolford also was concerned that [D.B.] had been the victim of hair pulling because there was obvious thinning of his hair on the right side of his head.

The x-rays conducted revealed that [D.B.] had "two rib fractures of different ages." One was a healing rib fracture of his 10th rib on the right side of his body, and the other was a rib fracture of the 5th rib on the right side of his body. Dr. Wolford noted that rib fractures "are highly concerning and usually associated with physical child abuse." The rib fractures were approximately two (2) to three (3) weeks old. Dr. Wolford also determined that [D.B.] had suffered significant "abdominal trauma, specifically [to] the liver." [D.B.'s] liver enzymes were 20 times the normal limit, which indicated a liver contusion and showed that "he had clearly taken blunt trauma to the abdomen." Dr. Wolford explained that, in order to sustain a liver contusion, "[g]reat force" had to be inflicted on the liver. She further explained that air bags being deployed as a result of a car accident would not even cause that type of injury.

Based on her examination of [D.B.], and based on her training, education, and experience, Dr. Wolford concluded that [D.B.'s] injuries were inconsistent with him receiving "one strike or one blow of some kind" because he had "multiple impacts across his head" that caused substantial bruising. Based on the nature and location of his injuries, it was her opinion that [D.B.] had "clearly been the victim of inflicted trauma." The fact that [D.B.] had "multiple hits in multiple planes of the head across both sides" led her to conclude that he was the "victim of child physical abuse." Dr. Wolford rejected the notion that [D.B.'s] injuries could have been the result of an accident because, although accidental bruising happens to children, "the most common sites of accidental bruises are shins, knees and foreheads." She determined that [D.B.'s] injuries were "not anywhere near" the type of accidental bruising that occurs in some children. Dr. Wolford explained that [D.B.'s] injuries were very serious and necessarily would have caused him "[s]ignificant" and "very substantial pain." It was clear that [D.B.] had sustained "multiple repeated hits to the face" and that there was "no way that [his injuries were caused] in one shot."

Dr. Wolford's overall diagnosis was that [D.B.] "had been the victim of physical child abuse on more than one occasion [ ] [a]nd likely repeatedly." Dr. Wolford firmly rejected the idea that a television set falling on a child could cause "two parietal skull fractures, one healing rib fracture, one acute rib fracture, bruising and hemorrhaging about the head, tissue damage around the eyes and a liver contusion." Dr. Wolford estimated that [D.B.] suffered "at least 20 blows to the head." She confirmed that "there is no way" that [D.B.'s] injuries were "caused by an accidental single event," and her opinions were rendered to a reasonable degree of medical certainty. Dr. Wolford explained that as a child abuse physician, it is her duty to assess whether injuries are caused accidentally or as a result of abuse. Based on her evaluation of [D.B.], Dr. Wolford testified persuasively that "there is absolutely no accidental explanation for the extent of [his] injuries."

At trial, [Salter] *testified on her own behalf* and denied that she was the cause of [D.B.'s] injuries. She recounted the volatile relationship that she had with David Bryant, as well as the altercation that had transpired between them on the day of the incident. She maintained that the significant injuries suffered by her son were caused by a 55-inch television falling off the dresser when David Bryant broke into her apartment on the night of the incident and assaulted her. [Salter] also disputed the validity of the video recording taken by David Bryant and denied that the text messages were sent by her.

[Salter's] friend, Tiesha Griffin, also testified on her behalf. Ms. [Griffin] had previously babysat [D.B.], but she had stopped babysitting him in August of 2014. Ms. [Griffin] admitted that she did not have any medical training, and she testified that, during the course of her watching [D.B.], she had never noticed any bumps or bruises on his head.

Trial Court Opinion, 10/3/17, at 2-10 (record citations omitted) (emphasis added).

Following a jury trial and sentencing, which included the presentation of a pre-sentence investigation report, Salter filed a timely post-sentence motion that raised both weight and sufficiency of evidence claims. After a hearing,

the court denied her motion. Salter timely appealed this determination, but only raised a weight of evidence claim with this Court. Ultimately, we affirmed her judgment of sentence on August 7, 2018.

Several weeks after our decision, Salter filed a *pro se* petition pursuant to the Post Conviction Relief Act ("PCRA"). **See** 42 Pa.C.S.A. §§ 9541-9546. Thereafter, appointed counsel amended that petition to assert trial counsel's failure to properly preserve a claim challenging the discretionary aspects of her sentence. Correspondingly, the court granted relief, and Salter's post-sentence and appellate rights, as to this specific issue, were reinstated *nunc pro tunc*.

Salter then filed a post-sentence motion, which was denied. In response, Salter filed a timely appeal, but ultimately, that appeal was dismissed by this Court due to counsel's failure to file a brief on her behalf.

Thereafter, Salter filed another *pro se* PCRA petition. After appointed counsel amended this later petition, which sought reinstatement of her right to appeal the discretionary aspects of sentencing issue, the lower court granted the relief sought. After this grant, Salter timely pursued the present appeal, and relatedly, the parties have complied with their obligations under Pennsylvania Rule of Appellate Procedure 1925. As such, this matter is ripe for review.

On appeal, Salter presents one question:

1. Did the trial court abuse its discretion in imposing an aggravated-range sentence at Count I based in part on Salter's

failure to display emotion and remorse at her trial, consideration of which impermissibly burdens her federal and state constitutional privileges against self-incrimination?

Appellant's Brief, at 8.

Given that Salter's sole issue on appeal is a challenge to the discretionary aspects of her sentence, we utilize a well-settled standard of review:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.
>
> The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal. An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence.
>
> > [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect[, *see* Pa.R.A.P. 2119(f)]; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.
>
> * * * *
>
> A substantial question will be found where an appellant advances a colorable argument that the sentence imposed is either inconsistent with a specific provision of the Sentencing Code or is contrary to the fundamental norms which underlie the sentencing process. At a minimum, the Rule 2119(f) statement must

- 8 -

articulate what particular provision of the code is violated, what fundamental norms the sentence violates, and the manner in which it violates that norm.

***Commonwealth v. Zirkle***, 107 A.3d 127, 132 (Pa. Super. 2014) (citations omitted) (some brackets in original).

In reviewing the record, despite the prior procedural irregularities, Salter has filed both a timely notice of appeal and adequate post-sentence motion, satisfying the first two components of our four-part analysis. In addition, as to the third factor, her brief contains a statement pursuant to Rule 2119(f), which provides, at least facially, the rationale as to how she has invoked this Court's jurisdiction. As such, with it being the only analytical component remaining, we must ascertain whether she has raised a substantial question.

Stated succinctly, "Salter contends that the trial court imposed its sentence based in part upon an improper factor: her failure to display emotion and remorse at her trial." Appellant's Brief, at 19. This Court has found, on many occasions, such a contention to constitute a substantial question capable of review. ***See, e.g***., ***Commonwealth v. Stewart***, 867 A.2d 589, 592 (Pa. Super. 2005) (holding that a claim asserting "the sentencing court considered improper factors in placing the sentence in the aggravated range … presents a substantial question on appeal[]").

Substantively, the gravamen of Salter's argument is that "the trial court abused its discretion … [by] imposing a harsher sentence on the ground that

she failed to display emotion or remorse at her trial[.]" Appellant's Brief, at 20. Salter avers that aggravating her sentence in this manner "impermissibly burden[ed] her federal and state constitutional privilege[s] against self-incrimination." *Id*.

As background, the court, in imposing a sentence of total confinement, must consider, *inter alia*, "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b).

Salter concedes that "a trial court is free to impose a harsher sentence on the ground that a defendant has not been remorseful[.]" Appellant's Brief, at 20. However, Salter believes that displaying a lack of remorse *at trial* implies that there is "a lack of desire to incriminate oneself." *Id*., at 21. Stated differently, showing remorse during trial proceedings is "expressive conduct communicating to the jury that [one] is guilty." *Id*. Salter tethers this supposition to the constitutional privileges a defendant has, both federally and in the Commonwealth of Pennsylvania, against self-incrimination. *See* U.S. Const., amend. V; Pa. Const. art. I. § 9. Salter then provides authority to demonstrate instances where a defendant's *silence*, at varying points of criminal proceedings, was impermissibly used against him in some capacity. *See* Appellant's Brief, at 21-22, *citing, e.g.*, **Griffin v. California**, 380 U.S. 609 (1965).

Distilled down, while acknowledging that the present matter is different because she testified on her own behalf, Salter questions whether a lack of emotion or remorse exhibited through her testimony *during trial* is a fact that can be used as an aggravating factor at sentencing. In other words, as Salter frames it, penalizing someone for testifying with no emotion is nonsensical and illegitimate, as such testimony could have been given pursuant to a genuine belief of innocence or at the advice of counsel.

Salter claims that the cases the court relies upon in stating that it appropriately considered her emotions and lack of remorse do not involve what happened at trial, but were at other phases of the judicial criminal process, such as during a sentencing allocution. Moreover, Salter declares that the court's consideration of an illegitimate factor, despite also relying upon legitimate factors, warrants remand for the record to be cleared of the taint of that illegitimate factor. Finally, as to the notion that Salter waived her self-incrimination privilege, she argues that this waiver in taking the stand did not mean "she was required to display emotion and remorse – i.e., guilt – throughout the trial on pain of a higher sentence." Appellant's Brief, at 26 (italics omitted).

In imposing an aggravated-range sentence, the lower court is permitted to consider any legal factor. ***See Commonwealth v. Stewart***, 867 A.2d 589, 592-93 (Pa. Super. 2005). "The trial court is vested with broad discretion in determining the defendant's sentence since the court is in the best position to

view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime." ***Commonwealth v. Begley***, 780 A.2d 605, 643 (Pa. 2001) (citation omitted). Moreover, "[l]ack of remorse is an appropriate sentencing consideration." ***Commonwealth v. Summers***, 245 A.3d 686, 695 (Pa. Super. 2021).

Prior to imposing its sentence, the court stated:

I had the opportunity to watch you throughout the entire trial. I got an opportunity to sit there, and I have a great view of the defense table from where I sit. And during that entire trial while pictures were shown of your son with horrible injuries, while testimony was proceeding about how this child was found abandoned on a pile of trash on the back porch, while cell phone video and audio was played of just screaming, you sat there without a shred of emotion. Never once during the course of this entire trial did you show the slightest bit of emotion for what your child had suffered; whether at your hands as the jury found or at someone else's as you continue to maintain. Not once. The only emotion you ever showed during that entire trial was for yourself at the point when you were convicted. That was it.

Sentencing Hearing, 11/30/16, at 23.

In its corresponding opinion, the court elaborated on its explanation given during the sentencing hearing:

[I]t was not just the lack of remorse exhibited by [Salter] throughout the trial to which this court referred during sentencing, but it was, perhaps more importantly, the lack of remorse and callous disregard for human life that [Salter] displayed at the time that she brutally assaulted her baby and left him outside in a garbage pile for dead that substantially weighed in favor of an aggravated range sentence. Additionally, [Salter's] conduct immediately after the assault, as captured by the text messages that she sent to the baby's father, as well as the video recording that the father took of [Salter] when he arrived at the residence, also factored heavily into the sentencing determination. Indeed by [Salter's] own words, she was aware that the assault she had just

- 12 -

committed was so heinous that her baby was probably dying outside next to the trash, but she did not care. It was all but an attempted murder committed by a mother against her own innocent and defenseless son.

Trial Court Opinion, 5/4/22, at 7 (record citations omitted). Next, the court proceeded to discuss the other bases it relied upon in determining the necessity of an aggravated sentence. **See id**., at 7-8 (illuminating Salter's "failure to seek or render aid, her attempted concealment of her crime to investigating authorities, and her attempt to shift blame for the assault on the baby's father"). The court then concluded that "these factors clearly illustrated the danger that [Salter] posed to the public in general and her potential for rehabilitation." **Id**., at 8-9 (citation omitted) (stating, further, that its conclusions "were informed by careful observation and attention at trial, a thorough and painstaking review of the [pre-sentence investigation report] in this case, and additional observations and consideration of evidence and argument presented at sentencing"). Finally, the court emphasized that Salter testified on her own behalf and, unlike other cases she has relied upon, that through her providing that testimony, there is absolutely no indication that the court used her own silence against her.

"[T]he trial court may base its findings regarding remorse on … its own observations of the defendant." **Commonwealth v. Bowen**, 975 A.2d 1120, 1127 (Pa. Super. 2009) (citation omitted). Despite contesting the constitutional validity of whether a court can make sentencing determinations inherently stemming from Salter's decision to testify on her own behalf, she

has presented no authority to show that relinquishment of the right against self-incrimination provides any sort of special benefit or should be considered differently in sentencing determinations. More importantly, Salter has shown no basis to deviate from the court's assessment that she lacked remorse, which was derived from its own permissible observations of her throughout trial. The court did not infringe on her constitutional protections against self-incrimination. To the extent that Salter, instead, argues that she effectively had to admit to the charged crimes at trial to lessen her ultimate sentence, such a contention is not congruent with what the court stated at sentencing. The court specifically indicated that even if the acts leading to D.B.'s injuries were not, in fact, perpetrated by Salter, she did not, among other things, show any type of empathy or acknowledgement of the precarious situation she had put her own child in by not rendering aid thereafter.

While Salter's brief is replete with many cases in which those defendants invoked their right against self-incrimination, in the absence of any case law provided by Salter clearly showing it to be impermissible when a court considers lack of remorse at trial when juxtaposed against a defendant testifying on her own behalf, it is unclear how the court was then not able to rely upon the observations it made both during her testimony and the trial more broadly. In other words, as silence, or her invocation thereof, was not used against Salter, there is no obvious constitutional dimension to her claim, and accordingly, there is no compelling reason to hold that the court relied

upon an impermissible factor in deviating from the standard sentencing guidelines as to her aggravated assault conviction.

Finally, we note that even if a sentence is predicated on an impermissible sentencing factor, as long as independently valid reasons exist for imposing an aggravated sentence, it must be affirmed. ***See Commonwealth v. P.L.S.***, 894 A.2d 120, 133 (Pa. Super. 2006). Here, the record reflects that the court, having also considered the pre-sentence investigation report, delved into all of the necessary factors and considerations that it needed to in order to impose the sentence that it did. **See** Sentencing Hearing, 11/30/16, at 24-25 (discussing aggravating and mitigating factors, such as, *inter alia*, the horrific nature of the crimes she committed, defenselessness of the victim as well as the victim's familial relationship with her, and Salter having been a victim, herself, of domestic abuse).

In finding no reason to conclude that the court abused its discretion when it crafted Salter's sentence, we affirm her judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/17/2023

- 15 -