J-S40027-25

2025 PA Super 290

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ZY'WON SAEED WARREN | : | |
| | : | |
| Appellant | : | No. 427 MDA 2025 |

Appeal from the Judgment of Sentence Entered January 29, 2025
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0001981-2021

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

OPINION BY PANELLA, P.J.E.:                    **FILED: DECEMBER 29, 2025**

Zy'Won Saeed Warren appeals from the judgment of sentence, a term of 12 to 24 months' incarceration, entered in the Court of Common Pleas of York County after he was convicted of possession with intent to deliver a controlled substance ("PWID"),[1] possession of a small amount of marijuana,[2] and defiant trespass[3] at a nonjury trial. On appeal, Warren challenges the suppression court's denial of his omnibus pretrial motion, the sufficiency of the evidence to support his defiant trespass conviction, the sentencing court's imposition of an aggravated range sentence, and the sentencing court's

_____

[1] 35 P.S. § 780-113(a)(30).

[2] 35 P.S. § 780-113(a)(31)(i).

[3] 18 Pa.C.S.A. § 3503(b)(1)(ii).

consideration of gang affiliation evidence. After careful consideration, we affirm.

This matter concerns Warren's March 24, 2021, arrest during which officers recovered a cellphone, one clear knotted baggy containing marijuana, six clear knotted baggies containing crack cocaine, a digital scale with white residue, and $350 cash from his person. Warren was subsequently charged with the above offenses and filed an omnibus pretrial motion to suppress evidence obtained pursuant to the allegedly unlawful seizure and subsequent search of his person, which the court denied on September 19, 2022, after hearing argument from both parties. The matter proceeded to a bench trial held from January 13th to January 14, 2025. The court summarized the pertinent evidence presented at trial as follows:

> On the afternoon of March 24, 2021, Detective Christopher Thompson, assigned to the [York City Police Department's] Violence Intervention Unit, was on duty. While in a marked police vehicle, Detective Thompson and a fellow officer took notice of a vehicle as it was "very clear" that the vehicle was travelling faster than the speed limit permitted. [*See* N.T. Trial, 1/13/25, at 71.] After taking notice of the vehicle, Detective Thompson looked into the vehicle [from his position in the police vehicle] and saw that the occupants were wearing full face masks. As Detective Thompson positioned his police vehicle behind the vehicle, the driver made an abrupt left turn and then pulled over to the side of the road.
>
> Concluding that the occupants of the vehicle did not want a police vehicle behind them, Detective Thompson drove past the parked vehicle and contacted Detective Daniel Kling, who was conducting surveillance nearby in an unmarked vehicle and plain clothing. Detective Kling proceeded to observe and provide updates over the radio for approximately the next 30 minutes. During this time, the occupants of the vehicle had exited the vehicle and were

roaming around various properties, alleyways, and breezeways before reaching the breezeway at 152 Lafayette Street. Detective Kling observed the individuals repeatedly entering and exiting the breezeway, one of them going to the edge of the porches and looking up and down, and on at least two occasions all retreating back into the breezeway when a marked police vehicle drove down the street before popping back out of the breezeway a few minutes later. Additionally, Detective Kling noted that the house at 152 Lafayette Street had a yellow no trespassing sign posted on the front of the house in the window.

Detective Kling testified to the process required to obtain a yellow no trespassing sign[] such as that [posted at 152 Lafayette Street. Detective Kling stated that these signs] can be obtained either by calling the police or visiting the police station and that the police gather the homeowner's information and enter it into a database so that the sign can be enforced without needing to speak to the homeowner. Here, the sign was posted[,] and the homeowner's information was on file, leading Detective Kling to conclude that the homeowner "did not want anybody on their property." [N.T. Trial, 1/14/25, at 131.]

Quinn Johnson, a York City School Police Officer, was standing on the block near the parked vehicle when the occupants exited the vehicle. Officer Johnson identified one of the occupants who exited the vehicle as Deandre Johnson. An officer of Pennsylvania State Parole, who was listening to the radio and recognized the name, communicated that Deandre Johnson was in violation of his state parole and requested that he be detained. At this point, in consideration of the ongoing trespassing and state parole violation, officers approached the individuals, who all ran away while wearing their face masks. Detective Thompson pursued and caught one of the individuals who was later identified as [Warren]. [Warren] was found with a clear knotted baggy of marijuana, six clear knotted baggies containing crack cocaine, a cell phone, $350 in cash, and a digital scale with white residue on it. The parties stipulated to the drug analysis which was read into the record. Detective Thompson further testified that there was nothing that indicated [Warren] was a user of crack cocaine or under the influence of crack cocaine at the time he was taken into custody.

Trial Court Opinion, 5/27/25, at 1-3 (record citations and unnecessary capitalization omitted). At the conclusion of trial, the court rendered numerous

findings and convicted Warren on all counts. With respect to Warren's defiant trespass conviction, the court specifically found that: (1) although "the breezeway was subject to joint ownership, it was still private property;" (2) "the no trespassing posting was sufficient to be reasonably likely to come to the attention of intruders[;]" and (3) "the individuals had the opportunity to see the no trespassing sign, specifically when they continuously exited the breezeway moving to the front porch before reentering" the breezeway. *Id.* at 4 (record citation omitted).

On January 23, 2025, Warren filed a motion to exclude testimony at his sentencing hearing concerning, *inter alia*, his alleged gang affiliation, which the court denied. On January 29, 2025, the court imposed a sentence of 24 to 48 months' incarceration for Warren's PWID conviction and guilt without further penalty for his remaining convictions. Warren timely filed a post-sentence motion, which the court denied on February 26, 2025. Warren timely filed a notice of appeal and a court-ordered concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b). In response, the trial court filed its opinions, pursuant to Pa.R.A.P. 1925(a), on May 27, 2025 and July 16, 2025.

On appeal, Warren raises the following questions for our review:

I.    Did the suppression court err in denying [Warren's] pretrial omnibus motion to suppress the stop and seizure of [Warren] and all evidence flowing therefrom where there was no reasonable suspicion for police to stop [him]?

II.     Was there insufficient evidence to support the guilty verdict for defiant trespass because there was no evidence that [Warren] entered or remained upon the breezeway without the right to do so, [Warren] knew he had no license or privilege to be in the breezeway, and there was notice against trespass of the breezeway given by a proper posting?

III.    Did the court abuse its discretion in sentencing [Warren] in the aggravated range for an unproven belief that "something bad" was going to happen and for a "protracted community experience" where there was no evidence or testimony presented that any member of the public even saw [Warren], let alone was placed in fear by his behavior?

IV.     Did the court err in allowing the Commonwealth to present testimony of a gang expert and evidence of [Warren's] alleged gang affiliation at sentencing because such testimony and evidence is irrelevant where there was no such testimony or evidence presented at trial to connect the instant convictions to gang activity; is prejudicial where it allows for consideration of mere alleged criminal acts that have gone uncharged; and is in violation of the rules of criminal procedure because an expert report was generated and never disclosed to [Warren]?

Appellant's Brief, at 6 (formatting altered; unnecessary capitalization and suggested answers omitted; issues reordered for ease of disposition).

In his first issue, Warren challenges the suppression court's denial of his omnibus pretrial motion to suppress evidence obtained during his investigative detention.

[O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is de novo. Where, as here, the defendant [appeals from] the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much evidence for the defense as remains uncontradicted. Our scope of review of

suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

Moreover, with respect to the suppression court's factual findings, it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part, or none of the evidence presented.

*Commonwealth v. Hoyle*, 337 A.3d 544, 561 (Pa. Super. 2025) (citations, quotation marks, and brackets omitted).

Warren avers that the suppression court erred in denying his motion to suppress because the officers lacked the requisite level of suspicion to justify the stop and seizure of his person. *See* Appellant's Brief, at 15. Specifically, Warren alleges that "[t]he specific observations articulated at the hearing by [Detective Thomas,] the only witness to testify[,] did not amount to reasonable suspicion that criminal activity was afoot and that [Warren] was involved." *Id.* Warren further contends that the court erred in considering Detective Thomas's description of the area in question as "high crime" where he failed to offer any "objective empirical evidence" to support his description. *Id.*

The Fourth Amendment to the United States Constitution and Article I, § 8 of the Pennsylvania Constitution guarantee the right to be free from unreasonable searches and seizures. *See* U.S. Const. Amend. IV; Pa. Const. Art. I, § 8. "To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with

citizens to the extent those interactions compromise individual liberty."

***Commonwealth v. Rice***, 304 A.3d 1255, 1260 (Pa. Super. 2023) (citation

omitted). The lawfulness of an interaction between a law enforcement officer

and a citizen depends upon the classification of the encounter; specifically,

whether the interaction constitutes a mere encounter, an investigative

detention, or a custodial detention. ***See id.***

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.
>
> * * *
>
> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a person of reasonable caution in the belief that the action taken was appropriate.
>
> The question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity. These circumstances are to be viewed through the eyes of a trained officer.
>
> > In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our

- 7 -

inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Id.* at 161 (brackets, citations, internal quotation marks, and ellipses omitted).

"Furthermore, it is well settled that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify an investigatory stop." *Commonwealth v. McCoy*, 154 A.3d 813, 819 (Pa. Super. 2017) (appellant's unprovoked flight and "evasive and suspicious behavior in a high crime area on a particularly cold winter night" gave rise to reasonable suspicion that criminal activity was afoot) (citation omitted). "The Commonwealth bears the burden of proving a high-crime area is, in fact, high in crime, and the suppression court is free to discredit the Commonwealth's evidence when appropriate." *Commonwealth v. Lewis*, 343 A.3d 1016, 1035 (Pa. 2025) (citations omitted).

[W]hen assessing whether an area is high in crime, a suppression court may consider a variety of factors, including, but not limited to: the geographic scope of the high-crime area; the nexus between the type of crime the area is known for and the type of crime suspected on the day of the stop; the officer's level of familiarity with the area; the recency of the officer's information; empirical data known to the officer; and the assignment of specialized police units targeting high-crime areas.

*Id.* at 1036 (citations omitted).

At the suppression hearing, Detective Thompson testified that he first observed a group of males, including Warren, exiting a parked vehicle in the

area of Lafayette Street and Cleveland Avenue and that he then lost sight of them for approximately twenty minutes. N.T. Suppression Hearing, 9/19/22, at 7, 19. Detective Thompson next observed that when officers approached the breezeway at 152 Lafayette Street from behind, Warren, wearing a full face mask, fled from the breezeway, sprinting "probably as fast as you could possibly run[,]" into Penn Park. *Id.* at 14, 16-17, 20, 25. Detective Thompson further indicated that, based on his training and experience, at that point he believed Warren had potentially committed a crime that required further investigation. *See id.* at 23. After considering the arguments offered by both parties, the suppression court rendered the following factual findings and legal conclusions:

> Well, what I heard the officer testify to is he observed [Warren] in the City of York sprinting out of the breezeway of 152 Lafayette Street dressed in all gray with a full-face ski mask on in a high crime area of the city. I think that raises a reasonable suspicion that [Warren] is up to no good, committing a crime or about to. Therefore, I think the stop was justified, and I deny your request for relief and the motion to suppress.
>
> [Defense Counsel,] if you believe I have misunderstood the state of the law regarding reasonable suspicion to stop, you apprise me of that, and I'll reconsider my decision. But I'm basing it on my recollection of the law that [in a] high crime area, fleeing from police can be enough to justify a stop. Added to that, we've got a full face mask.
>
> I mean, I got to tell you something, [if] I saw somebody doing that on Lafayette Street, I [would] think they are up to no good. I think that's a reasonable conclusion that would warrant further investigation. But, again, if you believe my understanding of the law in this area is outdated maybe, that's fine. You let me know. We'll take a look at what you have to say about that and we'll

come back. But I think that based upon my understanding, that's sufficient, so the motion is denied.

*Id.* at 28-29.

When viewing the totality of the circumstances through the eyes of a trained officer, we agree with the suppression court's determination that officers possessed a particularized and objective basis for suspecting that Warren was engaged in criminal activity and that further investigation was justified. *See Rice*, 304 A.3d at 1261. Moreover, Warrens' suggestion that the court's acceptance of Detective Thompson's description of the area as "high crime" was erroneous because it was unsupported by any objective or empirical evidence is in direct contradiction to controlling precedent. *See Lewis*, 343 A.3d at 1035 (declining "to impose a statistics requirement or adopt a strict test that must be satisfied before suppression courts may consider the relevant characteristics of an area when conducting a reasonable suspicion analysis"). At the suppression hearing, Detective Thompson indicated that he had two years of experience working in the City of York's Violence Intervention Unit task force, which frequently operates in the general vicinity of 152 Lafayette Street, and that the particular area of the city "is considered a high crime area" based on the higher incidences of arrests for firearms offenses, shootings, homicides, and drug possessions occurring there. N.T. Suppression Hearing, 9/19/22, at 6-8. The suppression court, as fact-finder, was free to credit or discredit this testimony and determine whether the Commonwealth met its burden of proving that the area in

question was in fact a high-crime area, and we discern no basis to disturb its finding. *See Lewis*, 343 A.3d at 1035-36.

Therefore, because the suppression court's factual findings are supported by the record and the legal conclusions drawn from those facts are correct, Warren's challenge to the denial of his motion to suppress fails. *See Hoyle*, 337 A.3d at 561. Accordingly, Warren's first issue does not merit relief.

In his second issue, Warren challenges the sufficiency of the evidence to support his defiant trespass conviction.

> Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. The Commonwealth may meet this burden of proving every element of the crime by utilizing only circumstantial evidence.
>
> The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt raised as to the accused's guilt is to be resolved by the fact-finder, so long as the evidence presented is not utterly incapable of supporting the necessary inferences. This Court does not independently assess credibility or otherwise assign weight to evidence on appeal.

*Commonwealth v. Riley*, 302 A.3d 112, 115 (Pa. Super. 2023) (citations, quotation marks, and brackets omitted).

"The purpose of the criminal trespass statute is to prevent unlawful intrusion onto real property or remainder thereon or to prevent unlawful breaches of the peace relating to realty." *Commonwealth v. Powanda*, 304 A.3d 1284, 1289 (Pa. Super. 2023) (citation omitted). A person commits the

summary offense of defiant trespass "if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given[.]"18 Pa.C.S.A. § 3503(b)(1). Notably, the offense of defiant trespass "requires an intentional *mens rea*[.]" **Powanda**, 304 A.3d at 1288. Accordingly, to sustain a conviction under Section 3503(b)(1), the Commonwealth must prove, beyond a reasonable doubt, that the defendant: "(1) entered or remained upon property without a right to do; (2) while knowing that he had no license or privilege to be on the property; and (3) after receiving direct or indirect notice against trespass." **Id.** (citation omitted). Section 3503 further specifies the methods by which notice may be given, including, *inter alia*, by "posting in a manner prescribed by law or reasonably likely to come to the attention of intruders[.]" 18 Pa.C.S.A. § 3503(b)(1)(ii).

Warren avers that the Commonwealth's evidence was insufficient as a matter of law to sustain his defiant trespass conviction because "[t]here was no evidence regarding who owned the breezeway or who resided in either property that was adjacent to the breezeway[,]" and the Commonwealth failed to establish that he "entered or remained upon the breezeway without the right to do so" or that he "knew he had no license or privilege to be in the breezeway." Appellant's Brief, at 15. Warren further contends that because there was no evidence offered to establish ownership of the breezeway, the

Commonwealth failed to prove that the "No Trespassing" sign posted at 152 Lafayette Street "gave notice against trespass of the breezeway." *Id.*

The trial court addressed Warren's sufficiency challenge as follows:

[Warren] alleges that "there was no evidence that" he remained in a breezeway without the right to do so; he knew he was not licensed to be in the breezeway; and that the breezeway was posted against trespass. The claim that "there was no evidence" is patently false. [The] house in whose breezeway [Warren] and his [counterparts] remained had a yellow no trespassing sign posted in the front window. The City of York allows homeowners to register so that a no trespassing sign on their property can be enforced without the need to contact them. Lastly, the individuals in the breezeway exited the breezeway to the front of the house and reentered the breezeway, meaning they could see the no trespassing sign on the home. In light of this evidence it is patently false to claim there was "no evidence."

Trial Court Opinion, 5/27/25, at 8-9. We agree.

At trial, Detective Kling testified that he observed Warren and others loiter in multiple breezeways, including the breezeway located between 152 and 154 Lafayette Street, over a period of approximately 15 to 20 minutes. *See* N.T. Trial, 1/14/25, at 128-29. Detective Kling further testified that a clearly visible yellow no trespassing sign, prohibiting entry "on the entire property[,]" was posted in a front window. *Id.* at 129, 141; *see also* Commonwealth's Exhibit 1. The no trespassing sign posted at 152 Lafayette Street was issued pursuant to the police department's "no trespassing program," and Detective Kling testified that he spoke with the resident, whose "information was on file[,]" and that the resident "did not want anybody on their property." N.T. Trial, 1/14/25, at 142, 131. Detective Kling observed the

- 13 -

individuals, including Warren, repeatedly approach the sidewalk in front of 152 Lafayette Street and retreat back into the breezeway whenever a marked police car drove by the premises, *see id.* at 131, which would have given the individuals multiple opportunities to see the no trespassing sign prominently displayed on the front porch. Detective Kling testified that the individuals' behavior was suspicious, as he observed that "[t]hey were constantly looking around, seeing who was around and what [] vehicles were traveling up and down the roadway[,]" and that their behavior changed "drastically" whenever a marked police vehicle approached, thereby demonstrating intent to evade detection by the patrolling officers. *See id.* at 133. When viewed in the light most favorable to the Commonwealth, we find this evidence sufficient to establish that Warren (1) entered and remained upon the property located at 152 Lafayette Street without a right to do so; (2) while knowing that he lacked license or privilege to be on the premises; and (3) after receiving notice against trespass as provided by the posted no trespassing sign. *Powanda*, 304 A.3d at 1288.

Moreover, the trial court aptly rejected Warren's argument premised upon ownership of the breezeway when it rendered its verdict:

> With respect to the arguments that the defense made about the joint ownership of the breezeway between[ ] 152 and 154[ Lafayette Street], that is true. If you look above the breezeway, the buildings join in proximately the middle. You know, property law is that the building is up and down, a reasonable distance below the ground and above the ground is the property line.

So each of the property owners owns half of that breezeway, but the property owners would have the ability to use those breezeways without permission of the other by virtue of that joint ownership. It doesn't mean that every person has the ability to use that breezeway as they please simply because each owner could use that breezeway as they please. It's still private property. It's just shared among the two private property owners. So I don't find that the joint ownership argument is persuasive with respect to the no trespass sign.

N.T. Verdict, 1/14/25, at 3-4. We discern no error.

Therefore, the Commonwealth presented sufficient circumstantial evidence to establish that Warren entered and remained on property, where notice against trespass was given, knowing he was not privileged or licensed to do so. **See** 18 Pa.C.S.A. § 3503(b)(1). Accordingly, Warren's second issue does not merit relief.

In his third issue, Warren challenges the discretionary aspects of his sentence. "A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." **Commonwealth v. Baker**, 311 A.3d 12, 18 (Pa. Super. 2024) (citation omitted).

Prior to reaching the merits of a discretionary sentencing issue, we conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

- 15 -

*Commonwealth v. Agugliaro*, 342 A.3d 105, 115 (Pa. Super. 2025) (brackets and case citation omitted). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Pisarchuk*, 306 A.3d 872, 878-79 (Pa. Super. 2023) (citation omitted).

Warren filed a timely notice of appeal, properly preserved the issue in a post-sentence motion for reconsideration of sentence, and included a Pa.R.A.P. 2119(f) statement in his brief. *See* Notice of Appeal, 4/1/25; Post-Sentence Motion, 2/4/25, at ¶ 10; Appellant's Brief, at 14. Moreover, Warren raises a substantial question by alleging that the sentencing court abused its discretion in imposing an aggravated range sentence based upon its consideration of impermissible sentencing factors. *See Commonwealth v. Salter*, 290 A.3d 741, 748 (Pa. Super. 2023). Therefore, Warren has properly invoked our jurisdiction, and we may review the merits of his discretionary sentencing claim.

Our standard of review for a discretionary sentencing challenge is well-settled:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its

- 16 -

judgment for reasons of partiality, prejudice, bias or ill will, or
arrived at a manifestly unreasonable decision.

*Agugliaro*, 342 A.3d at 116. In our review of the record, we must consider:

"(1) [t]he nature and circumstances of the offense and the history and characteristics of the defendant[;] (2) [t]he opportunity of the sentencing court to observe the defendant, including any presentence investigation[;] (3) [t]he findings upon which the sentence was based[; and] (4) [t]he guidelines promulgated by the commission." 42 Pa.C.S.A. § 9781(d).

Warren avers that the trial court abused its discretion by imposing an excessive, aggravated range sentence that was premised upon its consideration of impermissible sentencing factors, namely, "an unproven and speculative belief that 'something bad' would have happened" without intervention by law enforcement and "an unproven and speculative 'protracted community experience[,]' where there was no evidence or testimony presented that any member of the public even saw [Warren], let alone was placed in fear by his behavior." Appellant's Brief, at 31.

When imposing a sentence of total confinement, a court must consider the sentencing guidelines as well as "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). "The balancing of the sentencing factors is the sole province of the sentencing court." *Agugliaro*, 342 A.3d at 116. Although the sentencing court "is required to consider the sentence ranges set forth in the sentencing

guidelines," it is not bound by them, as they are purely advisory in nature and "merely one factor among many that the court must consider in imposing a sentence." **Pisarchuk**, 306 A.3d at 880 (citation omitted). Moreover,

> [i]n imposing an aggravated-range sentence, the lower court is permitted to consider any legal factor. The trial court is vested with broad discretion in determining the defendant's sentence since the court is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime.

**Salter**, 290 A.3d at 749 (citations and quotation marks omitted).[4]

At Warren's sentencing hearing, the court considered Warren's pre-sentence investigation report, the sentencing guidelines, and the recommendations proffered by both defense counsel and the Commonwealth. **See** N.T. Sentencing, 1/29/25, at 46-48, 51-54. Defense counsel also presented a mitigation argument centered on, *inter alia*, Warren's background and characteristics, mental health diagnoses, and need for rehabilitation and treatment. **See id.** at 48-53. Prior to imposing Warren's sentence, the court stated as follows:

---

[4] We note that both Warren and the Commonwealth incorrectly characterize Warren's sentence as falling outside the sentencing guidelines. **See** Appellant's Brief, at 31, 33; Appellee's Brief, at 42. However, "[a] sentence outside of the Guidelines is one imposed outside of all the recommended ranges, i.e., either below the mitigated range or above the aggravated range for a particular crime." **Commonwealth v. Mouzon**, 812 A.2d 617, 621 n.4 (Pa. 2002); **see** 204 Pa.Code § 303a.6(b) ("A sentence imposed in the standard range, aggravated range, or mitigated range is considered a sentence within the guidelines."). Accordingly, we clarify that the trial court sentenced Warren within the guidelines when it imposed an aggravated range sentence.

I'm obviously going to start with [PWID], and on that charge, given what we've heard, we are going to sentence [Warren] to the aggravated range, but I will say, only slightly aggravated, and the factors that we consider in doing that are the circumstances surrounding what led to [his] arrest.

[Defense Counsel] made the argument that, you know, perhaps if this would have been a traffic stop, and frankly, if it had been a traffic stop and all of the same things were found, in my opinion, it would have been better for [Warren] because a standard PWID, in my opinion, would be just that type of thing where the person comes to the attention of law enforcement for some reason and is apprehended with those, but here we have a course of events that took place over at least a half an hour, if not longer, throughout the community where these individuals were in people[']s backyards, up and down [alleys], in breezeways and that is precisely the type of action, regardless of whether it's gang-related or not, that is precisely the type of action that leads communities to have fear of what's happening or what is about to happen.

I indicated, and I believe it to be true, I think there was something bad that was going to happen when these three men were in the car and pulled over. I don't know that. It hasn't been proven. But, you know, my experience, at one point as a police officer, as an attorney who did defense work, and as a judge, is something bad is going to happen beyond just dealing drugs.

While [] Warren was not found in possession of a firearm, two of the other individuals that were with him were. And, again, I'm not making any connection to him in having a firearm through this, but there was a group of three young men and two of them had firearms.

And so, again, the circumstances that led to his arrest[,] I believe warrant sentencing in the aggravated range.

N.T. Sentencing, 1/29/25, at 55-56.

In its 1925(a) opinion, the trial court further explained its decision to impose an aggravated range sentence as follows:

- 19 -

> [T]he circumstances leading up to [Warren's] arrest included a course of events that took place over at least half an hour where a group of individuals, wearing face masks, possessing controlled substances and firearms, traversed the community to avoid law enforcement, through backyards, alleys, and breezeways, before running off through a public park in different directions creating multiple foot pursuits.
>
> While [Warren] points out the Commonwealth did not provide testimony or evidence "that any member of the public even saw [Warren], let alone was placed in fear by his behavior," such evidence is not necessary. We viewed the evidence as the extent to which [Warren] was willing to go to avoid the police, including hiding out on property owned by someone else, running through a public park to avoid police, and ending up being caught on another person's private property. [Warren's] actions showed a complete disregard for the individual property owners as well as the public. [Warren's] actions also show a disregard for the authority and safety of the police pursuing him.

Trial Court Opinion, 5/27/25, at 10-11. We discern no abuse of discretion by the trial court in fashioning Warren's sentence and find his contention that the court's considerations were speculative unavailing. The trial court was permitted to consider "any legal factor" when fashioning his aggravated range sentence, *see Salter*, 290 A.3d at 749, including the nature of the offense and its impact on the community, *see* 42 Pa.C.S.A. § 9721(b), and "[w]e cannot reweigh the sentencing factors and impose our judgment in the place of the sentencing court." *Commonwealth v. Bowens*, 265 A.3d 730, 764 (Pa. Super. 2021) (*en banc*) (citation omitted).

Therefore, the trial court properly exercised its discretion in imposing an aggravated range sentence. Accordingly, Warren's third issue does not merit relief.

In his fourth issue, Warren challenges the court's decision to admit gang affiliation evidence at his sentencing hearing.

> [T]he admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality.

*Commonwealth v. Greene*, 340 A.3d 324, 328-29 (Pa. Super. 2025) (citations omitted). Moreover, "[t]o determine an appropriate penalty, the sentencing court may consider any evidence it deems relevant." *Bowens*, 265 A.3d at 764 (citation omitted). However, "[i]nformation outside of the record, not subject to review and dispute[d] by the parties, is not properly considered." *Id.* (citation omitted).

Warren avers that the sentencing court erred in permitting Detective Thompson to testify as an expert in gang and gang member identification and in admitting evidence of Warren's alleged gang affiliation because such evidence is irrelevant where the Commonwealth offered no such evidence "to connect the instant convictions to gang activity" at trial. Appellant's Brief, at 16. Warren further contends that this evidence is prejudicial because it "allows for consideration of mere alleged criminal acts and behaviors that have gone uncharged" and that its admission violated Pa.R.Crim.P. 573(B)(1)(e) because Detective Thompson generated a written expert report that was never disclosed to the defense. *See id.* at 29-30.

- 21 -

Warren's argument is belied by the record. Prior to imposing Warren's aggravated range sentence, the court stated the following:

> I'm going to put on the record what does not, in my opinion, warrant or is not a factor in considering in sentencing in the aggravated range is the rap videos of which I heard testimony. I believe, unless there were actual acts of violence that were depicted in those videos, an individual's First Amendment Right to express themselves carries a lot of weight and it's going to take a lot to influence me that a rap video is something that we should consider an aggravated sentence.
>
> Was it evidence that Detective Thompson used to reach the conclusion that he believes Mr. Warren's part of a gang? Absolutely. I think that's an appropriate consideration, but not one that I'm going to use for aggravating a sentence.

N.T. Sentencing, 1/29/25, at 56. Accordingly, as the Commonwealth correctly contends, regardless of whether the trial court erred in admitting evidence of Warren's alleged gang affiliation, the prejudicial effect of any such error could not have contributed to the outcome where the court "explicitly disclaimed reliance upon it and articulated separate, independent, and proper grounds" for imposing an aggravated range sentence. Appellee's Brief, at 37. In its opinion, the trial court once again reiterated that

> it was [Warren's] conduct, **whether gang related or not**, which lead us to an aggravated sentence. Thus, we essentially ignored the testimony of the gang activity expert when imposing our sentence. Further, we expressly rejected certain aspects of the gang activity expert's testimony such as appearance in rap videos. Because we did not rely upon the gang activity expert's testimony, and expressly rejected parts of it, if it was error to allow the testimony, it was harmless error which does not entitle [Warren] to vacation of his sentence.

Trial Court Opinion, 5/27/25, at 9-10 (emphasis in original).

As detailed at length above, the trial court sufficiently articulated a multitude of proper reasons for imposing an aggravated range sentence, and Warren's claim is belied by the record. Accordingly, Warren's fourth issue does not merit relief.

Based on the foregoing, we affirm Warren's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/29/2025