J-A27008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN HART | : | |
| | : | |
| Appellant | : | No. 2402 EDA 2024 |

Appeal from the Judgment of Sentence Entered April 22, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001376-2020

BEFORE: BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BOWES, J.: **FILED JANUARY 13, 2026**

John Hart appeals from the judgment of sentence of sixteen to thirty-two years in prison, followed by five years of probation, imposed upon several convictions for his prolonged harassment of the victim, D.D. We affirm.

We glean the following facts from the certified record. D.D. moved from Turkey to the United States in 2012 on a college student visa when she was twenty-one years old. Her visa expired a few years later, but she stayed in the country without documentation. In March of 2018, she met Appellant during her shift at a sports bar. They exchanged cellphone numbers and began texting. In May 2019, they met for brunch and discussed D.D.'s separation from her now ex-husband and her immigration status. Appellant falsely claimed to D.D. that he was an attorney who could help her with the divorce and immigration. To facilitate that, D.D. disclosed several personal

details to Appellant. She also shared that she and her ex-husband were separated due to intimacy issues.

Over the course of the next few months, D.D. and Appellant occasionally met for dinner or drinks, but Appellant expressed frustration when D.D. did not respond promptly to his text messages or was busy. She also agreed to spend the night with Appellant once in November 2019. Around that time, D.D. began to receive aggressive texts from several unknown numbers. They referenced her posts on Instagram, immigration status, relationship issues between her and her ex-husband, and accused her of having had an abortion and a cocaine addiction. The messages insulted D.D. on multiple occasions, claiming that she was, among other things, a "selfish bitch," "bad wife," "slut," "evil," "abusive," "tramp," "unfit mother," "unfaithful," and "selfish coke whore." N.T. Jury Trial, 8/1/23, at 97, 110-11.

At first, D.D. believed that her ex-husband sent these messages. However, she began to suspect he was not the author because the language did not match his typical vernacular and they had been separated for some time. D.D. asked Appellant, whom she assumed was a lawyer, for help to track down the source of these messages. As the texts continued, D.D. became more frightened and told Appellant that she was too upset to socialize with anyone, and that she did not want to date him. Nevertheless, D.D. and Appellant kept in contact.

In early December 2019, Appellant offered to drive D.D.'s mother to the airport for her flight back to Turkey after a visit with D.D., and he additionally gave her $100. Once Appellant dropped her mother off, D.D. asked to stop at an ATM so she could pay Appellant back. They instead proceeded to a bar. D.D. told Appellant that she was still not ready to be in a relationship, and Appellant became visibly angry. He took D.D. home but did not say goodbye once they arrived.

During a text exchange a few days later, Appellant offered D.D. a ride home from work. She initially accepted, but then stated that she no longer needed transportation. Appellant accused the victim of being "selfish" and claimed that he was only "good enough to drive [her] mom to the airport or spot [her] mom a hundred, or get a lawyer for [her] green card." *Id*. at 122. The next morning, Appellant apologized over text message for his outburst, but the two continued to argue. D.D. also stated that she wanted to pay the $100 back to Appellant. Appellant insisted on meeting her at her workplace and informed her that:

> If the feds found out about [D.D. using someone else's tax information] and investigated, they would not only arrest [her], but [she] wouldn't be able to get out of jail because immigration would drop a detainer against [her]. [She] would serve whatever sentence and then get deported immediately thereafter. [Appellant] t[old her] this because if someone le[t] the feds know about [her] situation, it[ would be] all over for [her].

*Id*. at 127.

D.D. became scared that Appellant would seek to get her deported. The bickering messages continued, and Appellant sent D.D. a picture of a bruise on his arm. He accused her of hitting him, which D.D. claimed she did not do. Appellant also sent her emojis of a hand waving, a Turkish flag, and a plane, followed by an eggplant and a peach. *Id*. at 132-33. D.D. believed Appellant was signifying that he would deport her to Turkey if she did not have sex with him.

D.D. asked to meet Appellant that night at a restaurant to diffuse the situation. While there, Appellant asked if he and D.D. could be friends but have sex, which D.D. refused. She also rejected his attempt to kiss her. Appellant stormed out of the bar screaming that the victim would see her "mom a lot sooner than [she thought,] and the process [would start] tomorrow." *Id*. at 139.

D.D. called her friend on the phone as she walked home. In the meantime, Appellant sent her multiple hostile text messages and called her approximately twenty times. D.D. also had several missed calls from an unknown number. Upon arrival at her building, she noticed that Appellant's car was parked there. D.D.'s neighbor was outside smoking a cigarette, and he confirmed that a man fitting Appellant's description had entered the building. The neighbor escorted D.D. into the elevator, and when the doors opened to her floor, Appellant was standing outside. D.D.'s neighbor told Appellant to leave and the two began to engage in a physical altercation. D.D.

- 4 -

was still on the phone with her friend, whom she asked to call the police. Appellant then ran off.

He proceeded to repeatedly text message the victim that night, stating that she had to "[g]ive [him] what [he] want[ed] or say goodbye. . . . [She] ha[d] used guys [her] whole life, now it's [Appellant's] turn. . . . [She] made the wrong, wrong, wrong choice." *Id*. at 145. D.D. filed a police report that evening. The following morning, Appellant texted D.D. informing her that he could have reported her for domestic violence and have her "thrown in jail" where she could not escape until she was deported, and "[t]hat's the difference between [her] and [Appellant]." *Id*. at 146.

During this period, D.D. also discovered at least four Instagram accounts impersonating her. One of the profiles had a biography stating that she was "[j]ust an illegal alien trying to get a green card at US Department of Homeland Security." *Id*. at 146-47.

On December 10, 2019, D.D. filed for and obtained a temporary protection from abuse ("PFA") order against Appellant. Officers unsuccessfully attempted to serve it at Appellant's residence, and he subsequently arrived at the police station to express agitation with the number of officers at his home. The police served him with the PFA order at the station, and Appellant tried to lodge a complaint against D.D., alleging that she abused him a few days earlier. Since Appellant did not have injuries, the officers did not take further action.

Pursuant to D.D.'s police report, on December 11, 2019, Detective Steven Parkinson of the Philadelphia Police Department met with her.[1] D.D. showed the detective some of the anonymous text messages and calls she had been receiving, as well as the fake Instagram accounts. When he researched the phone numbers, Detective Parkinson discovered that the carrier was Google Voice, and he obtained warrants for each number. He found that one of the numbers was registered to an email address with Appellant's first and last name, John.Hart215@gmail.com, and the others were linked to an IP address at Appellant's home.

That same day, Appellant obtained a temporary PFA order against D.D., alleging that she verbally and physically assaulted him, was a cocaine addict, and was not a U.S. citizen. Officer Victoria Ayres of the Philadelphia Police Department served the PFA order on D.D., who immediately began to cry and stated that it was in retaliation for the PFA order she obtained against him. D.D. informed the officer that she was staying with her friend and begged her not to provide Appellant with her friend's address. When Officer Ayres returned to the station to file the report, Appellant was present and demanded a copy. The officer redacted the friend's address from Appellant's version,

_____

[1] The parties stipulated at trial as to Detective Parkinson's expertise in retrieving an internet protocol ("IP") address, and the evidentiary significance of IP addresses in identifying the source of online activity. The detective was also involved in a previous investigation where Appellant was convicted of stalking a different victim, E.K.

and he became irate. He eventually left the station but later called and demanded to know where D.D. was staying.

On December 14, 2019, D.D. received a phone call indicating that it was from her ex-husband. When she answered the call, however, she immediately recognized Appellant's voice and hung up. D.D. then called her ex-husband, but while on the phone with him, she had multiple calls appear with a caller ID as her ex-husband. D.D. continued to receive phone calls that were purportedly from her friends or her workplace, but when D.D. answered, the caller was a man disguising his voice to sound like a woman, or it was clearly Appellant's voice. D.D. filed a police report alleging that Appellant violated her temporary PFA order.

Later that night, Appellant arrived at the Haverford Township Police Department to report that D.D. called him and threatened his life. Once again, Appellant showed his phone to officers indicating that D.D. called him several times. Appellant submitted a signed statement accusing D.D. of threatening to kill him, and an officer prepared an application for an arrest warrant for D.D. Officers called D.D. and ordered her to stop contacting Appellant, even though she claimed she had not called or texted him.

On December 15, 2019, Appellant reported additional phone calls from the victim to the Haverford Township Police Department. The responding officer informed Appellant that they were in the process of obtaining an arrest

warrant based on his complaints from the previous night, and Appellant was angry that she had not already been arrested.

At approximately 2:00 a.m. on December 16, 2019, police received multiple 911 calls from a female caller reporting screams coming from D.D.'s apartment. However, D.D. was residing with her friend at that time. An officer responded to D.D.'s apartment and failed to discern any disturbance or make contact with anyone. The hearing for D.D.'s PFA petition against Appellant was scheduled for later that same morning. When the victim arrived, she saw Appellant speaking to sheriffs. He then winked at D.D. as the sheriffs proceeded to arrest her. She was subjected to strip and body cavity searches, and when she was permitted to make a phone call, she contacted Detective Parkinson.

The detective had the warrant withdrawn, and the sheriffs released the victim. Detective Parkinson and D.D. then discussed the phone calls she had been receiving since their last meeting. He obtained records from D.D.'s AT&T account to verify that she had never contacted Appellant after he obtained his PFA order. The detective believed that the phone logs Appellant had been showing to police officers, purporting to demonstrate calls from D.D., were feigned. Based on this information, he suspected that spoofing was involved. Detective Parkinson had experience with cases involving spoofing, which occurs when a caller disguises his identity by falsifying the information that appears on the caller identification. In these situations, Detective Parkinson

always began his investigation by contacting Spoofcard, LLC ("Spoofcard"), which is one of the "biggest" companies that provide spoofing services, and he did so in this matter. *See* N.T. Jury Trial, 8/4/23, at 82. Spoofcard confirmed that Appellant had an account.

Detective Parkinson thereafter obtained a search warrant for "[a]ny and all account information or associated with [the phone numbers D.D. received calls and texts from, including] call logs, IP addresses, IP location, billing information, [and] voice recordings." Affidavit of Probable Cause, 12/17/19, Appendix A. He also named Spoofcard as the possessor of records. Notably, Detective Parkinson did not include in the affidavit that he had contacted Spoofcard the day prior to confirm that Appellant had an account. However, Detective Parkinson detailed the above incidents as reported by D.D., specifically stating that she recognized Appellant's voice in the calls and alleged that he had "spoofed her cell phone number . . . to have evidence against her for the violation of the PFA [order]." *Id*. at Appendix B.

The warrant was issued, and when it was executed, it was confirmed that the phone numbers at issue were listed on an account with Spoofcard. The account was registered using Appellant's email address, a listed phone number matched the one Appellant provided to police as his own, two other listed phone numbers were linked to Appellant's girlfriend, and the account was paid for with a credit card in Appellant's name. Accordingly, Detective Parkinson believed that Appellant was the owner of this Spoofcard account.

The activity history evinced that Appellant disguised his phone number to call D.D., making it appear as though the calls were coming from her ex-husband, friends, and workplace. It was also established that Appellant used Spoofcard to create false logs, appearing as though D.D. called Appellant multiple times between December 12 and December 16, 2019. Additionally, Appellant used Spoofcard and voice-altering technology to make 911 calls the night of December 16. Detective Parkinson also used the GPS on Appellant's ankle monitor[2] and Spoofcard's location services to determine that Appellant was present in the same area when the Spoofcard account was utilized.

Officers therefore obtained an arrest warrant for Appellant and a search warrant for his home. Upon execution, officers discovered a cellphone with a dual-SIM card, which had two phone numbers matching the ones associated with the Spoofcard account in question. Detective Parkinson also confirmed that Appellant owned the Instagram accounts impersonating D.D. By way of a grand jury, Appellant was indicted on a litany of offenses, and a jury trial was scheduled.

Appellant filed a motion to suppress the evidence of the Spoofcard records, contending that the search warrant was unsupported by probable cause. During oral argument on the motion, the parties agreed to incorporate the transcript from the grand jury proceeding wherein, *inter alia*, Detective

---

[2] During the commission of the instant offenses, Appellant was required to wear an ankle monitor as part of his sentence for stalking E.K.

Parkinson and the victim testified. The court denied the motion, detailing its determination in written findings of fact and conclusions of law.

At the ensuing jury trial, D.D., E.K., and multiple detectives and officers, including Detective Parkinson, established the above facts. Additionally, a technology support agent from Spoofcard, James Marcano, attested to the accuracy of the records Detective Parkinson obtained, and an investigator from Citibank, Justin Davis, confirmed that Appellant used his credit card to pay for Spoofcard services.

The jury convicted Appellant of one count each of intimidation, retaliation, criminal use of a communication facility ("CUCF"), and harassment; two counts each of indirect criminal contempt for violations of a PFA order, false alarm to an agency of public safety, falsely incriminating another, and fictitious reports and unsworn falsification to authorities; and three counts of tampering with or fabricating physical evidence. The court deferred sentencing to obtain a pre-sentence investigation ("PSI") report.

At the sentencing hearing, the Commonwealth explained that if the court were to sentence Appellant in the aggravated range for each offense and ran them consecutively, it would amount to fifteen and one-half to thirty-one years of imprisonment. However, it requested twenty-five to fifty years to protect the public. Appellant advocated for two to four years. He presented Frank Dattilio, Ph.D., an expert in clinical and forensic psychology, who conducted a psychological evaluation of Appellant to determine whether he

was receiving adequate medical treatment and supervision in prison. He opined that if Appellant were released without treatment, he was at a moderate to high risk of reoffending. With proper treatment, Dr. Dattilio believed the risk could be reduced significantly, but stated that the programs he recommended for Appellant were not available at the Department of Corrections.

Appellant's girlfriend also testified, and she provided to the court letters on Appellant's behalf. The victim gave a statement, explaining how fearful she would be if Appellant were released back into the public, and the impact his actions have had on her. The Commonwealth noted that Appellant had harassed a female corrections officer while imprisoned, claiming that he could access information about her and her family on the internet, and threatened violence against his attorney. It further introduced recordings of phone calls Appellant made to his girlfriend while in prison, during which he stated that the jury and trial judge were incorrect and unintelligent, purporting to rebut the assertion of Appellant's counsel that Appellant was remorseful and took responsibility. Finally, Appellant exercised his right to allocution and contended that his statements during the prison phone calls did not accurately reflect his true feelings.

At the conclusion of the hearing, the court imposed an aggregate term of sixteen to thirty-two years in prison, followed by five years of probation. In sum, the court explained that Appellant's pattern of stalking women, the

sophisticated nature of his crimes, the seriousness of his offenses, the need to protect the public, and the impact on the victim warranted an upward deviation from the standard guidelines for each crime and consecutive sentences.

Appellant timely filed an unsuccessful post-sentence motion averring that his sentence was excessive in light of his non-violent crimes and that the court considered impermissible sentencing factors. This appeal followed, and Appellant and the trial court complied with the requirements of Pa.R.A.P. 1925. Appellant now raises the following issues for our analysis:

1. Whether the trial court erred in finding sufficient evidence to convict Appellant of intimidation, retaliation, [CUCF], and falsely incriminating another person, given that:

a. For intimidation, the Commonwealth failed to show that Appellant did anything with the intent to interfere with the administration of criminal justice or that he did anything other than continue to stalk the complainant after she broke up with him,

b. For retaliation, the Commonwealth failed to show that Appellant engaged in any conduct because of the complainant's role as a victim or witness in the PFA proceedings rather than because he was upset about the status of their relationship,

c. For CUCF, the Commonwealth failed to establish that Appellant acted at least recklessly with respect to the fact that any of the other offenses would be felonies given that they all could have been charged as misdemeanors, and

d. For falsely incriminating another person, the Commonwealth failed to show that Appellant specifically used Spoofcard to commit the offenses as required by the jury instructions given that the

Spoofcard evidence was entirely unreliable, contradicted by all other evidence, and unauthenticated.

2. Should the trial court have instructed the jury that [CUCF] requires that a defendant act at least recklessly with respect to the felony gradation of the substantive offenses[?]

3. Whether the trial court should have granted the motion to suppress Appellant's Spoofcard phone records given that the search warrant for the records did not contain probable cause and Appellant had standing to challenge the search of his own phone records, he had a reasonable expectation of privacy in his records, he could not abandon the records after the illegal search, and the Commonwealth called no witnesses and introduced no evidence that would have established inevitable discovery.

4. Whether the trial court should have excluded the Spoofcard records given their unreliability and the Commonwealth's inability to properly authenticate them.

5. Whether Appellant should receive a new sentencing hearing because the trial court imposed an unreasonable, excessive sentence and considered improper sentencing factors such as arrests that did not result in convictions and expunged PFA petitions.

Appellant's brief at 6-8.

Appellant's first group of challenges are to the sufficiency of the evidence to convict him of intimidation, retaliation, CUCF, and falsely incriminating another. We consider Appellant's position mindful of the following well-settled standard of review:

When reviewing a [sufficiency] claim, we face a question of law. Accordingly, our standard of review is *de novo*. We view the evidence in the light most favorable to the Commonwealth, as the verdict winner, and we draw all reasonable inferences therefrom in the Commonwealth's favor. Through this lens, we must ascertain whether the Commonwealth proved all of the elements of the crime at issue beyond a reasonable doubt.

- 14 -

The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, we may not weigh the evidence and substitute our judgment for the factfinder. Any doubts regarding a defendant's guilt may be resolved by the factfinder, unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Roberts*, 293 A.3d 1221, 1223 (Pa.Super. 2023) (cleaned up).

Starting with Appellant's conviction for intimidation, the statute for this offense provides, in relevant part:

A person commits an offense if, with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he intimidates or attempts to intimidate any witness or victim to:

(1) Refrain from informing or reporting to any law enforcement officer, prosecuting official or judge concerning any information, document or thing relating to the commission of a crime.

18 Pa.C.S. § 4952(a)(1). This Court has explained that "[a]ctual intimidation of a witness is not an essential element of the crime[,]" and an attempt to intimidate is sufficient. *Commonwealth v. Baker*, 313 A.3d 1112, 1117 (Pa.Super. 2024) (cleaned up).

Appellant avers that the Commonwealth failed to prove that he "did anything while acting with the intent to interfere with or the knowledge that his actions would interfere with the administration of criminal justice." Appellant's brief at 34. He contends that the evidence proved only that he stalked the victim, which is not enough to convict him of intimidation. *Id*. at

- 15 -

35-26. Also, since a petition seeking a PFA order is a civil matter and not a criminal one, Appellant states that he cannot be convicted of intimidation for interfering with a PFA order. *Id*. at 40. Finally, he argues that the Commonwealth neglected to introduce evidence that he was aware that the victim filed a police report or petitioned for a PFA order. *Id*.

The trial court concluded that the evidence was sufficient to uphold Appellant's conviction for intimidation. First, it explained that when Appellant showed up at D.D.'s apartment on December 8, and she asked her friend to call the police in his presence, Appellant sent her threatening text messages the next day. Trial Court Opinion, 11/5/24, at 30. Then, the court noted that when police served the PFA order on Appellant, he "spent the next six days engaging in an extraordinary number of actions to interfere with the administration of criminal justice, leading to D.D.'s arrest on the day of the scheduled PFA hearing based on false allegations and fabricated charges made by [Appellant] against D.D." *Id*. In sum, the court found that there was "overwhelming evidence" presented to the jury to convict Appellant of intimidation. *Id*. at 29-30.

We agree. The record supports the court's determinations, and we discern no error of law. Based on the Commonwealth's evidence, a jury could conclude Appellant intended to intimidate D.D. to prevent her from reporting his harassing behavior and his violations of the PFA order to police. We also fail to find law in support of Appellant's assertion that he could not be found

guilty of intimidation because PFA petitions are civil matters. Rather, the violation of a PFA order is a criminal offense, *i.e.* indirect criminal contempt. Appellant repeatedly violated D.D.'s PFA order by communicating with her while utilizing spoofing software. He also used Spoofcard to create false call logs representing that D.D. violated his PFA order, which led to her arrest and prevented her from testifying against him at her PFA hearing. Appellant's claims are therefore meritless.

Appellant next questions the sufficiency of the evidence for his conviction of retaliation. "A person commits [this] offense if he harms another by any unlawful act or engages in a course of conduct or repeatedly commits acts which threaten another in retaliation for anything lawfully done in the capacity of witness, victim or a party in a civil matter." 18 Pa.C.S. § 4953(A).

Appellant asserts that the Commonwealth did not meet its burden to show that he had "the intent to do anything to retaliate specifically because [D.D.] filed a PFA petition against him[.]" Appellant's brief at 42. He maintains that the Commonwealth "showed only that Appellant engaged in a pattern of stalking behavior that started long before the breakup and continued afterwards until he was eventually arrested." *Id*. Since his stalking conduct "continued unabated" after the victim filed the PFA petition, Appellant explains that he did not act "with the intent to retaliate because the complainant filed the PFA [petition]." *Id*. at 43. Instead, his intent was merely "to cause emotional distress." *Id*. at 44.

The court stated that Appellant's "argument ignores the evidence presented at trial that [Appellant] obtained a PFA [order] against D.D. the day after she obtained one against him, and that [Appellant] did so unlawfully based on false allegations that D.D. had hit him." Trial Court Opinion, 11/5/24, at 31. The court concluded that "there was ample evidence for the jury to" convict Appellant of retaliation. *Id*.

The court's conclusions are apt. Merely because Appellant engaged in stalking and harassing behavior prior to D.D. obtaining a PFA order does not negate the fact that his continued conduct afterward could be found to be retaliation against her for having done so. In fact, Appellant threatened to report D.D.'s immigration status and unsupported domestic violence before she had filed a PFA petition, but he did not. Rather, it was not until after Appellant had been served with a copy of the PFA order protecting D.D. that he obtained one for himself. He thereafter engaged in a course of conduct to punish D.D. for filing her PFA petition, as detailed above. Based on the sequence of events, the jury could properly conclude that Appellant retaliated against D.D. for acting as a claimant in the PFA process, which is a civil matter.

Appellant next avers that the Commonwealth did not meet its burden in proving he committed CUCF. Pertinently, "[a] person commits a felony of the third degree if that person uses a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title[.]" 18 Pa.C.S. § 7512. Our Court has recently

reiterated the elements of this offense: "(1) a defendant knowingly and intentionally used a communication facility, (2) with the intent to commit, cause, or facilitate an attempted underlying felony, and (3) the underlying felony was attempted or committed." *Commonwealth v. Aguilar*, 340 A.3d 311, 322 (Pa.Super. 2025) (citation omitted).

Appellant claims that CUCF requires the Commonwealth to prove that he knew or acted recklessly "with regard to the possibility that his criminal use of a communications facility would amount to the commission of some other felony instead of a misdemeanor." Appellant's brief at 44. He contends, without relevant legal authority, that he cannot be convicted of CUCF where he was unaware that he was in the process of committing a felony, not just a misdemeanor. *Id*. at 47. He summarizes that the evidence was insufficient to convict him of this offense where "[t]he Commonwealth showed only that Appellant stalked [the victim], he had been convicted of stalking before, and th[at prior] conviction was graded as a misdemeanor." *Id*. at 47-48.

The court found Appellant's argument regarding the *mens rea* of CUCF unpersuasive, and concluded that the evidence was sufficient to convict him of this crime. The court explained that "the *mens rea* requirements for CUCF are satisfied when a person knowingly and intentionally uses a communication facility, and knowingly, intentionally or recklessly facilitates an underlying felony." Trial Court Opinion, 11/5/24, at 32 (cleaned up). The court stated succinctly that "the evidence showed that [Appellant] knowingly used a

cellphone, and that he did so to intentionally, knowingly, and recklessly facilitate three separate felony offenses – witness intimidation, retaliation against a victim or witness, and stalking." *Id*.

We agree with the court and find no merit in Appellant's position that an element of CUCF includes knowledge that his actions would culminate in the commission of a felony as opposed to a misdemeanor. There is no such requirement in the statute governing CUCF, and we therefore "decline [Appellant's] invitation to add omitted language to an unambiguous statute." *Aguilar*, 340 A.3d at 323. Further, it is clear that the evidence supports each part of CUCF where Appellant knowingly used his cellphone, Spoofcard, and Google to stalk, intimidate, and retaliate against the victim. This argument therefore lacks basis in law or fact.

Finally, Appellant calls into question the sufficiency of the evidence to sustain his conviction for falsely incriminating another. "[A] person who knowingly gives false information to any law enforcement officer with intent to implicate another commits a misdemeanor of the second degree." 18 Pa.C.S. § 4906(a). This Court has established the four elements of this offense as follows: "(1) the defendant must have made the statement to a law enforcement officer; (2) the defendant's statement must be false; (3) the defendant must know the statement is false; and (4) the defendant must intend to implicate another." *Commonwealth v. Soto*, 650 A.2d 108, 110 (Pa.Super. 1994).

Appellant argues that "the Commonwealth failed to show that [he] committed th[is] offense specifically by using Spoofcard[.]" Appellant's brief at 49 (emphasis omitted). Although Appellant acknowledges that the Commonwealth "introduced Spoofcard records, credit card records, cell phone records, the testimony of the Spoofcard customer service technician, the testimony of Detective Parkinson, and the testimony of the Citi[bank] investigator[,]" he claims that this evidence was "so contradictory and unreliable that it is simply impossible to conclude beyond a reasonable doubt that Appellant actually committed the offense by using Spoofcard." *Id*. at 51.

The trial court determined that the Commonwealth presented "ample evidence" that Appellant falsely incriminated the victim using Spoofcard's services. *See* Trial Court Opinion, 11/5/24, at 33. It stated that Appellant "used Spoofcard to make it falsely appear that D.D. was calling him[,] in violation of a PFA [order]." *Id*. The court further noted that the email address for the Spoofcard account at issue was composed of Appellant's initials and date of birth, each of the three IP addresses through which the account was accessed was linked to Appellant, and the credit card used to pay for the Spoofcard account was in Appellant's name. *Id*. at 33-34. Additionally, it explained that GPS records confirmed that Appellant was present at the location when the Spoofcard application was being used, and D.D.'s AT&T records failed to show that her phone called Appellant when he had claimed to police officers that she had. *Id*. at 34.

The trial court is correct that the Commonwealth provided the jury with adequate evidence to convict Appellant of falsely incriminating another. As explained above with regard to the other crimes Appellant challenges, the record supports the court's finding that Appellant used Spoofcard to falsify phone records to appear as though D.D. violated Appellant's PFA order. No further discussion is necessary, and no relief is due as to any of Appellant's sufficiency claims.

Appellant next insists that the trial court omitted the requisite *mens rea* in its charging instruction for CUCF. In that vein:

> [When] examining jury instructions, our standard of review is to determine whether the trial court committed a clear abuse of discretion or an error of law controlling the outcome of the case. A charge will be found adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error. Moreover, in reviewing a challenge to a jury instruction the entire charge is considered, not merely discrete portions thereof. The trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury.

***Commonwealth v. Bradley***, 232 A.3d 747, 759 (Pa.Super. 2020) (cleaned up). This Court has also repeatedly stated that "[w]here the trial court's instructions track the Pennsylvania Suggested Standard Criminal Jury Instructions, it is presumed such instructions are an accurate statement of the law." ***Commonwealth v. Akhmedov***, 216 A.3d 307, 321 (Pa.Super. 2019).

Similar to his sufficiency claim as to CUCF, Appellant maintains that the trial court should have instructed the jury that for Appellant to be convicted of CUCF, he had to have "intended to commit a felony or knew that stalking

would be a felony" as opposed to a misdemeanor. **_See_** Appellant's brief at 55. In essence, Appellant believes that "the facilitation of a felony is a material element of the offense" such that "a defendant must act at least recklessly as to whether the facilitated crime could be a felony." **_Id_**. at 57.

The trial court stated in its Rule 1925(a) opinion that "contrary to [Appellant]'s position, the Commonwealth is not required to show that a defendant had knowledge of the felony grading assigned to the crime he committed through the use of a communication facility." Trial Court Opinion, 11/5/24, at 40. It also pointed out that it used the standard jury instruction for CUCF. **_Id_**.

We discern no abuse of discretion or error of law. The trial court issued a presumptively accurate instruction for CUCF. As mentioned, we find no support, and Appellant has presented none, for his contention that an element of CUCF includes the offender having knowledge that his actions would culminate in the commission of a felony. This claim lacks credence.

Appellant additionally challenges the trial court's denial of his motion to suppress the Spoofcard records. He raises a plethora of arguments on this topic, including that he had a privacy interest in the Spoofcard records. **_See_** Appellant's brief at 73-79. For the sake of brevity, we focus upon the

dispositive issue of whether the search warrant was supported by probable cause.[3]

The following legal precepts apply to our analysis of this issue:

[O]ur standard of review for the denial of a suppression motion is *de novo* and is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Our scope of review is to consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole. When the sole issue on appeal relates to a suppression ruling, our review includes only the suppression hearing record and excludes from consideration evidence elicited at trial.

**Commonwealth v. Ochoa**, 304 A.3d 390, 396 (Pa.Super. 2023) (cleaned up).

A warrant must be supported by probable cause, which "exists where the facts and circumstances within the affiant's knowledge and of which he

_____

[3] Our High Court has recently analyzed a similar issue as the one herein. In **Commonwealth v. Kurtz**, ___ A.3d ___, 2025 WL 3670767 (Pa. 2025), the Court considered whether (1) a privacy interest exists in one's unprotected search inquiries on Google, and (2) a warrant for those records was supported by probable cause. The Court issued a split decision. In the Opinion Announcing the Judgment of the Court, Justice Wecht, joined by Justices Dougherty and Brobson, addressed the privacy question and concluded that no such privacy interest exists. However, Chief Justice Todd, joined by Justices Mundy and McCaffery, found that the question concerning the warrant preceded the privacy-interest question. Since the warrant was supported by probable cause, these Justices did not find it necessary to reach the constitutional question. Finally, Justice Donohue dissented, finding both a reasonable expectation of privacy and a lack of probable cause. We therefore address the determinative issue of whether the warrant was supported by probable cause.

has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." ***Commonwealth v. Jones***, 988 A.2d 649, 655 (Pa. 2010) (cleaned up). Additionally, "a reviewing court is not to conduct a *de novo* review of the issuing authority's probable cause determination, but is simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant." ***Id***. (cleaned up). Furthermore, "a search warrant may be used as an investigative tool" where it is granted pursuant to the confines of Pa.R.Crim.P. 201. ***Id***. at 658 (emphasis omitted). That Rule provides that "[a] search warrant may be issued to search for and to seize . . . property that is or has been used as the means of committing a criminal offense." Pa.R.Crim.P. 201(b).

Appellant claims that "[b]ased solely on the affidavit[,] . . . the Commonwealth failed to establish that the magistrate had a substantial basis for concluding that probable cause existed because [it] was devoid of any facts from which the issuing authority could have found that Spoofcard was used in the planning or commission of a crime." Appellant's brief at 64. Appellant complains that the suppression court relied heavily upon "an assertion that Detective Parkinson called Spoofcard to verify that Appellant used it before he obtained the search warrant, but that information is not [in] the affidavit." ***Id***. Additionally, Appellant maintains that "the warrant does not contain any information as to the detective's experience, any reason to believe that

Spoofcard in particular was used, or any explanation of why evidence would be found in Spoofcard's records even if Spoofcard was used." *Id*. at 69.

In its findings of fact and conclusions of law, the suppression court determined that the affidavit was supported by probable cause. *See* Findings of Fact and Conclusions of Law, 5/12/21, at 6. Highlighting that warrants are to be viewed in a "practical, nontechnical" fashion, the court noted that the warrant specified Spoofcard, LLC, as the possessor of records and found that it was specific enough to support a finding of probable cause. *Id*. at 6-8.

Viewed in a commonsense manner, the affidavit provided the magistrate with specific facts to conclude that evidence of Appellant's crimes would be in Spoofcard's records. Contrary to Appellant's assertion, the affidavit states that Detective Parkinson had fifteen years of experience "investigating financial/economic crimes[.]" Affidavit of Probable Cause, 12/17/19, at Appendix B. The detective also explained in the affidavit that D.D. had been receiving calls purporting to be from her ex-husband and friends, but when she answered she recognized Appellant's voice. Further, he indicated that Appellant obtained a PFA order against D.D. after she filed one against him, and Appellant had "spoofed her cell phone number" to claim to authorities that D.D. violated Appellant's PFA order. *Id*. Although the warrant failed to include that Detective Parkinson contacted that company the day prior to confirm that Appellant had a Spoofcard account, the affidavit otherwise included sufficient detail to deduce that Appellant was using spoofing technology as the means

to harass, stalk, intimidate, and retaliate against the victim. *See* Pa.R.Crim.P. 201(b).

Appellant further takes issue with the admission of the Spoofcard records at trial because "they were not properly authenticated or reliable." Appellant's brief at 82. "Our standard of review for a trial court's evidentiary rulings is narrow, as the admissibility of evidence is within the discretion of the trial court and will be reversed only if the trial court has abused its discretion." *Commonwealth v. Hernandez*, 230 A.3d 480, 489 (Pa.Super. 2020) (citation omitted).

Rule 901 governs the admissibility of evidence, and provides that "[u]nless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). For example, a witness with knowledge may authenticate an item with "[t]estimony that an item is what it is claimed to be." Pa.R.E. 901(b)(1).

Some evidence may be self-authenticating, however, including:

> The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with Pa.R.C.P. No. 76. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

Pa.R.E. 902(11). In that vein, Rule 803 relevantly provides that the following is not excluded by the rule against hearsay:

- 27 -

**(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:

(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit; [and]

(C) making the record was a regular practice of that activity[.]

Pa.R.E. 803.

Although the Commonwealth presented a Spoofcard employee, Mr. Marcano, and a certification pursuant to Rule 803(6), Appellant argues that "the Commonwealth failed to show that the records were real." Appellant's brief at 82. Appellant acknowledges that "[e]vidence may be authenticated by a witness with knowledge that the item is what it is claimed to be." *Id*. at 82-83 (citing Pa.R.E. 901(b)(1)). He avers, however, that Mr. Marcano "did not qualify as a person with direct knowledge of anything" because he was not a custodian of records or involved in the preparation or maintaining of the records, and therefore he could not authenticate the Spoofcard evidence. *Id*. at 84.

The court determined that it was within its discretion to admit the Spoofcard documents "as records of a regularly conducted activity based on a certification by Spoofcard's custodian of records[.]" Trial Court Opinion, 11/5/24, at 38. The court explained that "[c]ontrary to [Appellant]'s claims

otherwise, the Spoofcard records were self-authenticating under Rule 902(11) based on the certification by the custodian of records." *Id*. at 38-39. Additionally, it maintained that Appellant's "contention that [Mr. Marcano] was not a custodian of records is inapposite – the records were properly admitted pursuant to the certification, not based on the testimony of the Spoofcard witness." *Id*. at 39.

The court did not abuse its discretion. The Spoofcard records were self-authenticating in accordance with Rule 902(11). The Commonwealth provided the certifications to Appellant prior to trial, and he in fact objected to them. *See* Appellant's brief at 84 (stating that he contested the certifications "at every turn," including motions *in limine*). The certifications confirmed that the records Detective Parkinson obtained were made at or near the time that the information was transmitted, created and kept in the ordinary course of business, and authored by a person with knowledge. *See* Commonwealth's Exhibit C-83; Pa.R.E. 803(6). No relief is due.

Finally, Appellant challenges the discretionary aspects of his sentence. To invoke this Court's review of the merits of this issue, an appellant must satisfy the following four-pronged test:

> (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post-sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

***Commonwealth v. Fuentes***, 272 A.3d 511, 520 (Pa.Super. 2022) (cleaned up).

Appellant has preserved his objection in a post-sentence motion, timely appealed, and included a Rule 2119(f) statement in his brief. Additionally, he has raised a substantial question by averring that "the trial court imposed a manifestly excessive sentence, double-counted Appellant's prior record and the offense gravity scores of the offenses charged, and considered improper sentencing factors[.]" Appellant's brief at 28. ***See Commonwealth v. Watson***, 228 A.3d 928, 936 (Pa.Super. 2020) ("[A] claim that the court double-counted factors already considered in the sentencing guidelines raises a substantial question."); ***Commonwealth v. Haynes***, 125 A.3d 800, 808 (Pa.Super. 2015) ("[A] claim that the sentence is manifestly excessive, inflicting too severe a punishment, does present a substantial question."); ***Commonwealth v. Stewart***, 867 A.2d 589, 592 (Pa.Super. 2005) ("[An] assertion that the sentencing court considered improper factors in placing the sentence in the aggravated range . . . presents a substantial question on appeal."). Therefore, we address the merits of Appellant's argument.

It is well-settled that "[s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." ***Commonwealth v. Salter***, 290 A.3d 741, 748 (Pa.Super. 2023) (cleaned up). In imposing a sentence, the court must consider "the protection of the public, the gravity of the offense

as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant."  42 Pa.C.S. § 9721(b).  Where a court orders a pre-sentence investigation ("PSI") report, we presume that it was aware of and properly considered all mitigating factors.  ***See Watson***, 228 A.3d at 936.

Generally, "[i]t is impermissible for a court to consider factors already included within the sentencing guidelines as the sole reason for increasing or decreasing a sentence to the aggravated or mitigated range."  ***Id***. at 937 (cleaned up, emphasis omitted).  We have confirmed that courts, however, "can use information included in the guidelines to supplement other peripheral sentencing information," including "prior convictions in conjunction with past unsuccessful attempts to rehabilitate, or the fact that the new crimes violated parole, or that the defendant's ongoing criminal record demonstrated a threat to public safety . . ., even though the guidelines take into account those prior convictions."  ***Id***.

Appellant states that the court imposed an excessive sentence that was outside the sentencing guidelines and "erred in considering unproven arrest records and *ex parte* PFA orders, as well as other factors which were not supported by the record."  Appellant's brief at 87.  Relying upon ***Commonwealth v. Berry***, 323 A.3d 641 (Pa. 2024), Appellant contends that a trial court cannot consider "an arrest that did not result in a conviction as a factor at sentencing."  ***Id***. at 88.  Since the court stated that it "considered all

of the information presented" at the sentencing hearing, Appellant equates that to the court impermissibly using Appellant's prior arrests that did not result in convictions as the reason to deviate upwards from the standard guidelines. *Id*. at 91. He acknowledges that the court cited "several aggravating factors on which it based its sentence, including the extreme manipulation of the victim, the infliction of extreme mental cruelty on the victim, the use of sophisticated means to commit the crimes, and the criminal conduct that 'far exceeded' what was necessary to prove the elements of the offenses." *Id*. at 97. Nevertheless, Appellant claims that "the trial court imposed an excessive sentence given Appellant's non-violent criminal record, the non-violent nature of the offenses, and Appellant's need for rehabilitation." *Id*. at 94.

The court recited the reasoning for Appellant's sentence at the sentencing hearing. Namely, it considered Appellant's "extensive history and pattern of targeting, harassing[,] and stalking women, [as well as] his conduct in this case, which . . . all indicate very strongly that [he] presents a grave danger to the public and especially to women." N.T. Sentencing, 4/22/24, at 102. Further, it "recognize[d] that his convictions and criminal history have already been factored into the sentencing guidelines" but explained that it was considering "the pattern of his criminal history . . . that is seen over the course of years starting at the age of [twenty-six]." *Id*. Specifically, the court noted that Appellant had "multiple convictions for harassment[,] for stalking, for

making terroristic threats[,] for intimidation of a witness or victim[,] and a number of violations of probation or parole for those cases." *Id*. Additionally, the court listened to the victim's impact statement and concluded that Appellant's "criminal conduct against her caused her to experience extreme fear, anxiety, trauma." *Id*. at 103.

Furthermore, the court explained that Dr. Dattilio opined that Appellant would be at a moderate to high risk of recidivism if promptly released. *Id*. at 111-12. Additionally, the court found significant that Appellant harassed a female corrections officer while imprisoned, threatened violence against his attorney, committed these offenses while wearing an ankle monitor for his stalking conviction against E.K., and feigned his remorse. *Id*. at 110-13.

The court also outright rejected Appellant's contention that it considered his prior arrests that did not lead to convictions. Plainly, the court stated that "[t]he record shows that at no point during the sentencing hearing did the [c]ourt make any reference to any arrests that did not lead to criminal convictions." Trial Court Opinion, 11/5/24, at 47. Additionally, it explained that it "never referenced any PFA[ petitions] against [Appellant,] dismissed or otherwise," other than the one D.D. filed. *Id*.

We fail to note any abuse of discretion. The court placed ample reasoning on the record as to why it deviated upwards from the standard range of the sentencing guidelines. In fact, its explanation spanned fourteen pages of the sentencing hearing transcript. *See* N.T. Sentencing, 4/22/24, at

100-14. The court appropriately considered the severity of Appellant's conduct, the impact on the victim, Appellant's need for rehabilitation, and the need to protect the public. *See* 42 Pa.C.S. § 9721(b). As detailed *supra*, although the guidelines took into account Appellant's prior convictions, the court properly weighed Appellant's "prior convictions in conjunction with past unsuccessful attempts to rehabilitate[,]" that he committed these offenses while on supervision, and his "ongoing criminal record demonstrated a threat to public safety[.]" *Watson*, 228 A.3d at 937. Although the Commonwealth advocated for an even harsher sentence, the court had a PSI report and presumably considered all mitigating factors to arrive at the sentence it imposed. *Id*. at 936.

Appellant's reliance on *Berry* is also inapt, as that case is easily distinguishable. There, the defendant was being sentenced for a first conviction. *See Berry*, 323 A.3d at 644. However, the sentencing court specifically stated that it considered his previous arrests, which did not result in convictions, as a reason to deviate upwards from the standard guidelines. *Id*. Here, the record fails to reflect any indication that the court considered Appellant's arrests that did not lead to convictions. Rather, it specifically stated that Appellant had been repeatedly arrested and convicted of multiple harassment-related crimes. *See* N.T. Sentencing, 4/22/24, at 104.

For all of the foregoing reasons, none of Appellant's many claims warrants relief. Accordingly, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/13/2026